J-A11032-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| ANNELLE M. BUFFENMEYER | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MITCHELL B. BUFFENMEYER | : | |
| | : | |
| Appellant | : | No. 1187 MDA 2023 |

Appeal from the Order Entered July 21, 2023
In the Court of Common Pleas of Lebanon County Civil Division at No(s):
2019-20745

| | | |
|---|---|---|
| ANNELLE M. BUFFENMEYER | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MITCHELL B. BUFFENMEYER | : | No. 1257 MDA 2023 |

Appeal from the Order Entered July 21, 2023
In the Court of Common Pleas of Lebanon County Civil Division at No(s):
2019-20745

BEFORE:  BOWES, J., STABILE, J., and MURRAY, J.

MEMORANDUM BY BOWES, J.:                    **FILED: OCTOBER 4TH, 2024**

Annelle M. Buffenmeyer ("Wife") and Mitchell B. Buffenmeyer

("Husband") cross-appeal from the trial court's July 21, 2023 order that

finalized the divorce and equitable distribution.[1]  We affirm in part, vacate in part, and remand for further proceedings.

Both Husband and Wife are thirty-five years old.  They married in February 2009 and separated on October 16, 2019.  Twenty months later, Wife filed for divorce seeking, *inter alia*, equitable distribution, alimony, and counsel fees and expenses.  The trial court appointed a divorce master, hereinafter referred to as the "master" or "Special Master", who held an evidentiary hearing on April 8, 2022.  As it related to equitable distribution, the parties presented the following pertinent evidence.

Two children, L.B. and T.B., were born of the marriage during July 2013 and 2017, respectively.  Wife exercises primary physical custody of L.B. and sole physical custody of T.B., who is profoundly disabled.  N.T., 4/8/22, at 16.  While Husband exercises partial physical custody with L.B. one night a week and on alternating weekends, he has no custodial periods with T.B. because he lacks the required training to care for the child's developmental and medical needs.  **Id**.  Husband previously agreed to complete a five-session training regimen, but as of the date of the evidentiary hearing before the divorce master, he failed to attend a single session.  **Id**.

As to the parties' respective wages and earning capacity, the trial court found as follows:

---

[1] We consolidated the appeals for disposition on October 24, 2023.

[Wife] is in mostly good health and capable of employment. [She] operates a salon and possesses both a cosmetology license and a salon owner license. [Her] parents own the land where the salon is located, and [she] does not pay rent. [Wife] works approximately thirty hours per week for $10 an hour when she is able. However, [her] ability to work is affected by her childcare responsibilities[, including contributing to T.B.'s in-home nursing care.]

[Husband] is in mostly good health and capable of employment. [He] is employed full-time working on power lines and responding to emergency calls for PP&L Electric Utilities [("PP&L")]. [His] employment [includes a health benefit package and two retirement accounts: a 401(k) defined contribution plan valued at $84,786.60, as of April 1, 2022 and a defined benefit pension valued at $126,890.00, as of January 17, 2022. He] also is a landlord and receives rental income. Overall, [Husband] was the breadwinner, while [Wife] was the homemaker during their marriage. [Wife] and [Husband] had a good standard of living during their marriage.

[Wife's] standard of living has declined since separation, but she is able to save some money. Similarly, [Husband's] standard of living has declined as well. [Husband] stated he cannot pay for his expenses and obligations at this point. Notably, [Husband] was paying $1,141.50 per child in child support and paying $1,203.08 in spousal support. [Husband] appealed the order. [Wife] does not think she would be able to pay for her own expenses using only the child support and her own earnings without the spousal support.

Trial Court Order and Opinion, 7/20/23, at 8-9 (unnecessary capitalization omitted).

The court summarize the post-hearing proceedings as follows:

The Special Master filed her report on October 27, 2022. The report recommended the following: (1) [Wife] and [Husband] should be divorced pursuant to 23 Pa.C.S.A. [§] 3301(d); (2) the net estate should be approximately divided 60% to [Wife] and 40% to [Husband]; (3) [Wife's] request for counsel fees should be granted in the amount of $12,709.50; and (4) [Wife's] request for alimony should be conditionally granted in the amount of

- 3 -

$1,203.08 per month which was the same amount as the spousal support.

On November 3, 2022, [Husband] . . . filed exceptions to the report. The exceptions alleged the Special Master erred by: (1) granting alimony, and (2) failing to take into consideration the fluctuating value of [Husband's defined contribution] 401(k). [Wife] . . . filed cross-exceptions . . . [that] alleged the Special Master erred by: (1) not awarding [Husband's] 401(k) account to [Wife], (2) not awarding [Wife] a higher monthly amount of alimony, and (3) not requiring [Husband] to provide security, such as life insurance, for payment of alimony.

*Id*. at 10 (unnecessary capitalization omitted).

The trial court overruled all the exceptions, and on July 21, 2023, it entered the above referenced order consistent with the master's recommendations. This timely appeal and cross-appeal followed. Husband and Wife complied with Pa.R.A.P. 1925, and the trial court issued an order referring this Court to its Order and Opinion filed on July 21, 2023.

Wife presents three issues for our review:

A.     Whether the trial court erred in failing to effectuate the most straightforward equitable distribution scheme by not awarding [to her Husband's] 401k account . . . and instead awarding [her] Husband's defined benefit pension?

B.     Whether the trial court erred in failing to award . . . Wife alimony in an amount sufficient to meet her expenses?

C.     Whether the trial court erred in failing to require . . . Husband to provide security for payments of alimony to Wife?

- 4 -

Wife's brief at 8.[2]

Husband's cross-appeal raises the following four questions:

1. Did the trial court err in affirming the recommendations of the [master] who awarded [Wife] alimony in an amount equal to a spousal support calculation, for a period of [fourteen] years, when added to the amount paid by [Husband] through the present would require him to pay [seventeen] years of alimony for a [marriage that lasted less than eleven years]?

2. Did the trial court err in affirming the recommendations of the [master] who awarded . . . Wife alimony, for the minority of the parties' youngest child, when the testimony established [that] Wife received [sixteen] hours per day of skilled care services, in the home, that would permit her to work a fulltime job?

3. Did the trial court err in affirming the recommendations of the [master] who awarded . . . Wife alimony . . . for [fourteen] years . . . when she is young, has a professional license, and a free location from which to run her business?

4. Did the Trial Court err in affirming the recommendations of the [master] who awarded . . . Wife an excessive term of alimony and 60% of the marital estate; when alimony is a secondary remedy, and the award received by . . . Wife. . . . would be sufficient without the necessity of alimony?

Husband's Cross-Appeal brief at 13-14 (unnecessary capitalization omitted).

We review the forgoing claims in light of the following principles:

Our standard of review in assessing the propriety of a marital property distribution is whether the trial court abused its discretion by a misapplication of the law or failure to follow proper

---

[2] As Wife withdrew her third issue relating to Husband providing security for the alimony award, we do not address it.

legal procedure. An abuse of discretion is not found lightly, but only upon a showing of clear and convincing evidence.

*Busse v. Busse*, 921 A.2d 1248, 1257 (Pa.Super. 2007) (citation omitted).

Additionally:

In determining the propriety of an equitable distribution award, courts must consider the distribution scheme as a whole. We measure the circumstances of the case against the objective of effectuating economic justice between the parties and achieving a just determination of their property rights.

Moreover, it is within the province of the trial court to weigh the evidence and decide credibility and this Court will not reverse those determinations so long as they are supported by the evidence. We are also aware that a master's report and recommendation, although only advisory, is to be given the fullest consideration, particularly on the question of credibility of witnesses, because the master has the opportunity to observe and assess the behavior and demeanor of the parties.

*Carney v. Carney*, 167 A.3d 127, 131 (Pa.Super. 2017) (cleaned up).

In fashioning an equitable distribution award, "the trial court must consider, at a minimum, the eleven factors set forth in 23 Pa.C.S. § 3502[.]"

*Gates v. Gates*, 933 A.2d 102, 105 (Pa.Super. 2007) (cleaned up). The Pennsylvania Divorce Code ("Divorce Code") enumerates these factors as follows:

(1) The length of the marriage.

(2) Any prior marriage of either party.

(3) The age, health, station, amount and sources of income, vocational skills, employability, estate, liabilities and needs of each of the parties.

(4) The contribution by one party to the education, training or increased earning power of the other party.

(5) The opportunity of each party for future acquisitions of capital assets and income.

(6) The sources of income of both parties, including, but not limited to, medical, retirement, insurance or other benefits.

(7) The contribution or dissipation of each party in the acquisition, preservation, depreciation or appreciation of the marital property, including the contribution of a party as homemaker.

(8) The value of the property set apart to each party.

(9) The standard of living of the parties established during the marriage.

(10) The economic circumstances of each party at the time the division of property is to become effective.

(10.1) The Federal, State and local tax ramifications associated with each asset to be divided, distributed or assigned, which ramifications need not be immediate and certain.

(10.2) The expense of sale, transfer or liquidation associated with a particular asset, which expense need not be immediate and certain.

(11) Whether the party will be serving as the custodian of any dependent minor children.

23 Pa.C.S. § 3502(a).

In reviewing a trial court's distribution order, this Court will not engage in a factor-by-factor review of the trial court's rulings. Rather, "we look at the distribution as a whole, in light of the court's overall application of the . . . § 3502(a) factors for consideration in awarding equitable distribution. If we fail to find an abuse of discretion, the order must stand." *Lee v. Lee*, 978 A.2d 380, 383 (Pa.Super. 2009) (cleaned up).

- 7 -

Wife's first issue concerns the trial court's decision to award her a lump sum dollar amount from Husband's defined benefit pension rather than his Husband's 401(k) plan, a defined contribution account. *See* Wife's brief at 18. According to Wife, the 401(k) has an assigned marital value of $84,786.60, as of April 1, 2022. *Id*. at 19. The defined benefit pension, which the trial court awarded to Wife, has a marital value of $126,890.00, as of January 17, 2022. *Id*. Despite the pension having a greater value, Wife claims that she should have been awarded Husband's defined contribution 401(k) account because of its relative liquidity. She asserts, "This [defined benefit] account, unlike a 401(k) account, cannot be divided so that Wife receives a lump sum now." *Id*. at 18.

This Court has recognized there are two methods of awarding a defined benefit pension:

> The first method, "immediate offset," awards a percentage of the marital portion of the value of the pension to the party earning it, and offsets the marital value of this pension with other marital assets at equitable distribution. This method is preferred where the estate has sufficient assets to offset the pension, because it does not require the court to retain jurisdiction indefinitely. The second method, "deferred distribution," generally requires the court to retain jurisdiction until the pension is collected, at which point the pension is divided according to the court's order. This method is more practical where the parties lack sufficient assets to offset the marital value of the pension.
>
> **We have recognized that neither distribution scheme will be appropriate to all cases. Rather, the trial court must balance the advantages and disadvantages of each method according to the facts of the case before**

- 8 -

> **it in order to determine which method would best effectuate economic justice between the parties.**

***Conner v. Conner***, 217 A.3d 301, 312 (Pa.Super. 2019) (emphasis added, citations omitted).

Wife sets forth her preference for the defined contribution 401(k) plan thusly:

> The defined contribution [plan] funds can be transferred into Wife's name now, and she can reinvest it into a qualified account of her choosing, or she can cash in all or a portion of that now (and bear the resulting tax consequences). The distribution scheme put forth by the trial court ignores the constraints of the defined benefit pension plan and causes the parties to be financially intertwined going forward….

Wife's brief at 22-23 (capitalization modified). In contrast to the comparative accessibility of Husband's 401(k), Wife accurately asserts that her access to the funds in the defined benefit pension plan "is dependent on when it goes into pay status." ***Id***. at 23. According to Wife, although the trial court directed Husband to complete the forms necessary to transfer the asset, no such forms exist for an immediate transfer because it is impossible to extract a lump sum from a defined benefit pension plan to effectuate equitable distribution. ***Id***. 23-24. She further argues that the trial court cannot simply enter a qualified domestic relations order ("QDRO") to complete the proposed transfer. ***Id***. at 24. Hence, she requests that we reverse the equitable distribution order and remand for the trial court to award to her Husband's defined contribution 401(k) account and supplement that award with additional assets to attain an

equitable distribution in light in the difference in the value between the two accounts. *Id.* at 24-25.

Citing **Braderman v. Braderman**, 488 A.2d 613 (Pa.Super. 1985), Husband counters that it is within the trial court's discretion to determine whether an immediate offset or a deferred distribution method is appropriate under the circumstances. *See* Husband's Appellee brief at 29. Further, he highlights that Wife never indicated during the master's hearing her preference for either retirement plan, while he specifically requested to keep the defined contribution 401(k) plan. *Id*. at 30-31.

Instantly, the equitable distribution order awarded Wife 60% of the value of the marital estate, *i.e.*, $257,443.69. *See* Trial Court Order, 7/20/23, at 1-5. However, because there was insufficient cash for an immediate offset, the court directed that Wife receive the $77,365.52 proceeds from the sale of the marital home, a $53,188.17 payment from husband, and Husband's defined benefit pension valued at $126,890. *Id*. at 4-5.

The trial court explained its decision to award Wife the defined benefit pension as follows:

> [Wife's] counsel argued that the Special Master should have awarded [Husband's] 401(k) to [Wife]. However, [the trial] court notes that [Husband] specifically requested to keep his [defined contribution plan] and that the Special Master found an equitable way to accommodate his request while achieving economic justice. [The trial] court agrees with the Special Master's decision. [The court] also notes that, if [Wife] would be awarded [Husband's defined contribution plan], then [Wife's] other awards would be proportionally affected to maintain the right balance [the court] believes

- 10 -

the Special Master recommended. [The court] finds that the Special Master specifically considered economic justice and [Wife's] and [Husband's] financial needs when allocating the assets and distribution percentages. While [the trial court] is not bound by the report and recommendations by the Special Master, [the court] finds that awarding [Husband's defined contribution plan] to him and the value it was assigned seem fair and just in these circumstances, especially when considering the entire combination of awards for the parties. *Kohl v. Kohl*[, 564 A.2d 222,] 224 [(Pa. Super. 1989)]; *Morschhauser v. Morschhauser*[, 516 A.2d 10,] 15 [(Pa. Super. 1986)]; *Kleinfelter v. Kleinfelter*[, 463 A.2d 1196,] 1197 [(Pa. Super. 1983)]. Therefore, th[e] court finds that the Special Master did not err or abuse her discretion in her awarding [Husband's defined contribution plan] to him….

Trial Court Opinion, 7/20/23, at 20-21. The trial court's findings are supported by the record and its rationale is sound. While Wife complains about the lack of cash or easily convertible assets, those concerns are unwarranted. She received $130,553.69 in proceeds from the sale of the marital home and payments from Husband, which is more than one-half of her share of the equitable distribution award, and she retained the remainder as a deferred income stream for retirement.[3] Accordingly, we discern no abuse of

_____

[3] Wife is correct insofar as the defined benefit pension is not subject to an immediate lump sum transfer. Indeed, that type of transaction is antithetical to the deferred distribution method that the trial court utilized in this case. Thus, to the extent that the trial court did not specifically reference the need for a QDRO, and presuming that Husband's pension is subject to the Employee Retirement Income Security Act (ERISA), upon remand, the trial court must enter a QDRO assigning the designated portion of Husband's pension benefit to Wife as an alternate payee. *See* 17 West's Pa. Practice, Family Law § 23:4 (8th ed.). However, recognizing that a pension plan "may even provide that a distribution may be made to an alternate payee before the participant

*(Footnote Continued Next Page)*

- 11 -

discretion. *See Conner*, 217 A.3d at 312 ("the trial court must balance the advantages and disadvantages of each method according to the facts of the case before it in order to determine which method would best effectuate economic justice between the parties"). Wife's first claim merits no relief.

Wife's remaining issue, and all of the claims that Husband presents in his cross-appeal challenge aspects of the trial court's alimony award of $1,203.08 per month, an amount the trial court gleaned from a spousal support order entered in December 2021. The trial court directed that the award last so long as Wife continues to care for T.B., who is seven years old, barring remarriage or Husband's death. Wife assails both the amount and the duration of the alimony award. Wife's brief at 25-29. First, as to the length of the award, Wife challenges the court's decision to terminate alimony when T.B. attains the age of majority. *Id*. at 28. Rather, she argues that it is more appropriate to maintain the alimony "for as long as [T.B.] is unable to care for himself." *Id*.

In relation to the amount, Wife argues that the trial court applied the guidelines without considering her unique childcare expenses and the gap

---

reaches earliest retirement age," Wife's bare assertion that the trial court cannot simply enter a QDRO to transfer her rights to a portion of that asset is unavailing. *Id*. Moreover, insofar as the trial court retains jurisdiction over the deferred distribution of Husband's pension, *see Conner*, 217 A.3d at 312, the court is free to enter a QDRO that specifically permits it to modify the QDRO to cure any errors or deficiencies that arise after the divorce is final. *See* 17 West's Pa. Practice., Family Law at § 23:4.

between her expenses and her ability to pay them. *Id*. at 29. Focusing upon the disparity of the parties' respective income and earning potential, Husband's failure to provide any level of care for T.B., and the fact that approximately one-half of her equitable distribution is deferred until Husband's pension reaches pay status, Wife maintains that the marital assets she received "will not serve to replace a necessary part of the income upon which [she] relies." *Id*. 27-28. Succinctly, Wife argues, "[i]n failing to consider Wife's reasonable needs, the trial court abused its discretion in assessing an amount of monthly alimony [she is] due[.]" *Id*. at 29.

Husband counters that an increase in alimony is not warranted based upon Wife's earning capacity as a certified cosmetologist and salon owner with sixteen hours of skilled in-home nursing care for T.B., that allows her to work outside of the home. Husband's Appellee brief at 32. He further asserts Wife operates her salon from her parent's home rent free. *Id*. at 32. Thus, highlighting Wife's testimony that Husband's support obligations satisfied 53% of her monthly expenses totaling $4,000 and the fact that she received a 60% share of the marital estate, Husband asserts that the court did not err in rejecting Wife's entreaty to increase Husband's monthly alimony obligation. *Id*. at 33-34.

Furthermore, in opposing the alimony award in his cross-appeal, Husband specifically challenges both the amount and fourteen-year duration of the alimony award based on the comparatively short ten-year marriage,

Wife's earning capacity, and his financial contributions to the children's health care, unreimbursed medical expenses, tutoring and counseling services, and a portion of L.B.'s school tuition. Husband's Cross-Appeal brief at 25-35. While presented as four separate arguments in his cross-appeal, Husband's core contentions are spun from the identical thread: his inability to pay alimony without incurring additional deficit spending. We address both parties' arguments collectively and, for the reasons explained below, conclude that while alimony is warranted under the facts of this case, the trial court erred in determining the amount of the award when the record bears out that Husband is unable to satisfy it.

We review the trial court's award of alimony for an abuse of discretion. *See Conner*, 217 A.3d at 315. As we have explained:

> [T]he purpose of alimony is not to reward one party and to punish the other, but rather to ensure that the reasonable needs of the person who is unable to support himself or herself through appropriate employment, are met. Alimony is based upon reasonable needs in accordance with the lifestyle and standard of living established by the parties during the marriage, as well as **the payor's ability to pay**. Moreover, alimony following a divorce is a secondary remedy and is available only where economic justice and the reasonable needs of the parties cannot be achieved by way of an equitable distribution award and development of an appropriate employable skill.

*Id*. at 315-16 (cleaned up) (emphasis added). The Divorce Code provides that, "[i]n determining whether alimony is necessary and in determining the nature, amount, duration and manner of payment of alimony," the trial court must consider the following seventeen factors:

- 14 -

(1) The relative earnings and earning capacities of the parties.

(2) The ages and the physical, mental and emotional conditions of the parties.

(3) The sources of income of both parties, including, but not limited to, medical, retirement, insurance or other benefits.

(4) The expectancies and inheritances of the parties.

(5) The duration of the marriage.

(6) The contribution by one party to the education, training or increased earning power of the other party.

(7) The extent to which the earning power, expenses or financial obligations of a party will be affected by reason of serving as the custodian of a minor child.

(8) The standard of living of the parties established during the marriage.

(9) The relative education of the parties and the time necessary to acquire sufficient education or training to enable the party seeking alimony to find appropriate employment.

(10) The **relative assets and liabilities of the parties**.

(11) The property brought to the marriage by either party.

(12) The contribution of a spouse as homemaker.

(13) The **relative needs of the parties**.

(14) The marital misconduct of either of the parties during the marriage. The marital misconduct of either of the parties from the date of final separation shall not be considered by the court in its determinations relative to alimony, except that the court shall consider the abuse of one party by the other party. As used in this paragraph, "abuse" shall have the meaning given to it under [§] 6102 (relating to definitions).

(15) The Federal, State and local tax ramifications of the alimony award.

(16) Whether the party seeking alimony lacks sufficient property, including, but not limited to, property distributed under Chapter 35 (relating to property rights), to provide for the party's reasonable needs.

(17) Whether the party seeking alimony is incapable of self-support through appropriate employment.

23 Pa.C.S. § 3701(b). Critically, however, "the factors in Section 3701(b) do not create an exhaustive list." *Conner*, 217 A.3d at 316 (citation omitted).

In addressing the parties' respective exceptions to the master's recommendations, the trial court reviewed the relevant statutory factors, as well as the master's recommendation, and opined as follows:

> After considering the seventeen factors above, the Special Master determined that economic justice in this case specifically requires an award of alimony. The Special Master found that the award of alimony to [Wife] is necessary here because [Wife] lacks sufficient property for her reasonable needs even after considering giving her sixty percent of the net marital estate and an award of counsel fees, so the Special Master achieved economic justice by conditionally awarding [Wife] alimony as well. [The trial court] agrees with the Special Master that the awards in conjunction provide [Wife] with sufficient income to obtain the necessities of life.
>
> Contrary to [Husband's] requests, [the court] finds that [Wife] will need the alimony in the amount of the spousal support while she continues to care for [T.B]. Contrary to [Wife's] requests, [the court] finds that alimony in the amount of $2,000.00 per month[,] and which would persist indefinitely[,] is not required in this case. . . . The spousal support amount, which is being adopted for the purpose of alimony, was carefully determined after a review of incomes and expenses, and [Husband] is already struggling to pay his own expenses and obligations. Moreover, [Wife] is capable of work once [T.B.] no longer

- 16 -

requires intensive care. Overall, [the] court finds the Special Master found the right balance with her recommended awards. . . . [C]onditionally awarding alimony to [Wife] seems fair and just in these circumstances, especially when considering the entire combination of awards for the parties.

Trial Court Opinion, 7/20/23, 18-19 (citations omitted).

The certified record supports the trial court's decision to award Wife alimony for the duration of T.B.'s minority. During the master's hearing, Wife testified about her income and expenses related to the beauty salon she maintains rent free on her parents' property. N.T., 4/8/22, at 11-14. Wife explained that she does not keep a set schedule because she must accommodate for T.B.'s numerous medical appointments, including "a four-night stay at Hershey Medical Center to have a continuous EEG to see if he's having . . . seizures." *Id*. at 12, 36. Her availability also is tied to the skilled nursing assistance she receives during the day. She explained that her son's health condition makes scheduling difficult.

I do what I can. . . . [T.B.] does have nursing in the home which does help me to be able to work, but . . . not all the shifts are always filled or he'll be up during the night, and I don't have a night nurse or he'll be sick. Yesterday[,] he was on oxygen, and I needed to leave work early to take him to a doctor's appointment.

*Id*. at 17.

Wife's struggle to establish consistent hours of operation is further aggravated by the volume of appointments that have been scheduled for T.B.

- 17 -

yearly since 2020: approximately 128 days, including multiple appointments on a single day. *Id*. at 18-19.

Even when Wife is available to serve her clients, the business revenue fluctuates and as of the date of the hearing, she had $2,350 in her business's bank account. *Id*. at 13-14. Wife testified,

> some months I'm busier [than others]. Around the holidays my schedule is busier, and then some months it's not so busy. So there … have been some times were I've had to take loans from my parents, but I'm paying them back as well with my legal fees and everything like that. I'm paying them as I go.

*Id*. at 25.

Wife's income from the beauty salon is supplemented by the combined $2,344.58 she receives from Husband in monthly child support and spousal support (allocated as $1,141.50 and $1,203.08, respectively). *Id*. at 64-65. As it relates to the necessity of spousal support, Wife noted that she would not be able to pay the family's living expenses based solely upon her earnings and receipt of Husband's child support payments. *Id*. at 65.

Wife also testified about the financial impact of serving as the custodial parent, which she asserted she tackles without consistent contribution from Husband. *Id*. at 21-25. Specifically, she pays T.B.'s yearly school tuition and other costs associated with his education and unreimbursed speech therapy. *Id*. at 24. Likewise, she covers the unreimbursed expenses for L.B.'s medications and his yearly tuition totaling $4,252 for attending New Covenant Christian School. *Id*. at 25, 33. In addition to her personal

expenditures, Wife calculates her total monthly expenses to be $4,447.88, including $700 per month that she pays to her parents in rent for the home she shares with the children. *Id*. at 21-22, Plaintiff's Exhibit 3 (Average Monthly Personal Expenses).

Similar to Wife, Husband also presented evidence of his financial condition. His testimony outlined the wages and benefits he receives from his position with PP&L. *Id*. at 95. As a non-salary employee, he earns approximately $51 per hour for a forty-hour work week, provides for the children's insurance, and is current with his monthly child support obligation of $1,141.50. *Id*. at 103, 146; Defendant's Exhibit 17.

Regarding the parties' standard of living during the marriage, Husband testified they resided in an unassuming home but lived comfortably. *Id.* at 105. He explained, "We had nice things even though we were in a modest house. There wasn't nothing we couldn't do really." *Id.*

Throughout the marriage, Husband maintained a pre-marital checking and savings account that he opened when he "was about 18 years old." *Id.* at 106. He initially accumulated approximately $25,000 in the account and contributed $20,000 to purchase the marital home. *Id.* He made all mortgage payments on the home and had saved $60,000 by the date of separation. *Id*. at 106-07. Husband testified, "I just worked all the time." *Id.* at 107.

Unfortunately, the funds were depleted by post-separation expenses. *Id*. at 108. Husband explained,

They are basically nonexistent now. They went to lawyers and . . . the first two years of separation, [Wife] got to keep [$]1800 or [$]1900 of my paycheck. I got to keep [$]800. I'm the one that moved out of our house and lived in a rental property. . . . I had to pay rent, and like this whole time I've been in the deficit, this entire time. Thank God we got a little bit of modification that allowed me to keep $1500 of my paycheck…. I'm still in red, but it's a breath of fresh air, but they are of course fighting it.

*Id.* at 108. Husband continued to pay the mortgage of approximately $700-800 per month. *Id.* at 109. Likewise, he paid Wife's bills, including cell service, internet, and utilities until December 2019. *Id.* at 110. At that time, Domestic Relations Section attached $2,300 per month of his wages. *Id.* at 110, 117. Husband noted that very little remains of the marital estate, except cash and the proceeds from the sale of the marital home. *Id.* at 113. He also asserted that, including his support obligations, his expenses now exceed his income. *Id.* at 120.

In fashioning Wife's alimony award, the trial court reviewed the statutory factors in light of the foregoing evidence and determined that ten of the factors[4] favored Wife while only two factors relating to the ages and conditions of the parties and "[t]he property brought to the marriage by either party," respectively, weighed in favor of husband. Trial Court Opinion, 7/20/23, at 18. It deemed the five remaining factors to be neutral or

_____

[4] The court determined that factors one, three, five, six, seven, ten, twelve, thirteen, sixteen, and seventeen all favored Wife. Hence, the record belies Wife's contention that the court failed to consider Wife's inability to satisfy her reasonable financial needs. *See* Wife's brief at 29.

irrelevant. The court ultimately concluded that Wife "will need the alimony in the amount of the [December 2021] spousal support while she continues to care for [her disabled son.]" *Id*. at 19.

As set forth above, the trial court conducted a thorough analysis of evidence and statutory factors, and determined that alimony is warranted throughout the minority of T.B. *See* Trial Court Opinion, 7/20/23, at 18-19. Although T.B. receives skilled nursing support, the evidence established that T.B.'s extensive needs restrict Wife's ability to work to her full capacity. Under the circumstances of this case, we discern no error or abuse of discretion in the court's decision to award alimony to Wife. *See Conner*, 217 A.3d at 315.

While we uphold the court's sound decision to award Wife alimony in this case, as we elucidate *infra*, we nevertheless find that the trial court erred in adopting the 2021 calculation of Husband's income and expenses for purposes of his spousal support obligation in fashioning the amount of the instant monthly alimony award because it failed to consider the current economic impact of the award on Husband's ability to pay that amount, as established in the certified record. As noted *supra*, although the court specifically acknowledged Husband's "struggle. . . to pay his own expenses and obligations" after satisfying "[t]he spousal support amount [that it] adopted for the purpose of alimony," it nevertheless concluded that neither factor that related to Husband's liabilities and ability to pay that amount militated in his favor. *Id*. Rather, the trial court reasoned the $1,203.08 that

Husband has labored to satisfy since its imposition in December 2021 somehow struck "the right balance[.]" *Id*. Hence, notwithstanding the fact that the record reveals that Husband has been in deficit spending while trying to comply with the spousal support obligation, the court determined that it was proper to transition that obligation into alimony. *Id*.

Husband's testimony regarding the current state of his financial affairs was a key component for the court to consider in fashioning the alimony award. Otherwise, the award will ultimately prove inoperable insofar as Husband is incapable of complying with it. The trial court's decision to condemn Husband to fourteen additional years of deficit spending constitutes an abuse of discretion.

We are mindful that we must defer to the trial court in matters regarding the weight of the evidence and credibility of the witnesses. However, this is not a case where we are simply substituting our opinion for that of the factfinder. Indeed, the trial court specifically accepted Husband's repeated testimony regarding his deficit spending and nevertheless doomed him to that inevitability by adopting the amount of the spousal support obligation that Husband has struggled to satisfy. *Id*. Although highly deferential, our standard of review does not require us to disregard the trial court's misapprehension of Husband's financial reality.

Furthermore, even though the trial court stopped short of a wholesale adoption of the spousal support order in determining the amount of the

alimony award, it specifically endorsed that sum, noting that the December 2021 support order represented the guideline amount fashioned "after a review of incomes and expenses." Trial Court Opinion, 7/20/23, at 19. However, a review of the basic support calculation[5] reveals that the spousal support amount upon which the trial court relied to fashion the instant alimony award had **not** been adjusted, as permitted by Pa.R.Civ.P. 1910.16-5, to consider, *inter alia*, Husband's "unusual fixed obligations," "relative assets and liabilities," and "the duration of the marriage[.]" **See** Rule 1910.16-5(b)(1), (5) and (8). Thus, to the extent that the trial court relied upon the calculation of Husband's basic spousal support obligation in 2021 to fashion the instant alimony award, that determination omitted at least two of the enumerated alimony factors and, more importantly, it did not address the specific complaint that Husband raised in his objection to the award, *i.e.*, his inability to pay alimony without incurring additional deficit spending. Hence, the trial court abused its discretion by failing to engage in a nuanced examination of Husband's ability to pay Wife's reasonable needs. Compare the facts of this case with **Crocker-Fasulo v. Fasulo**, 292 A.3d 591, 598-99 (Pa.Super. 2023), where we held that the trial court did not abuse its discretion in declining to terminate the alimony award because it had considered the totality of the circumstances and found "Husband still has the ability to pay."

---

[5] **See** N.T. 4/8/22, at 171 (Defendant's Exhibit 12).

As Husband's deficit spending was not properly considered in the trial court's assessment of his ability to pay alimony, we vacate the award and remand for the court to recalculate the obligation in light of Husband's actual financial circumstances.[6]

---

[6] The dissent misconstrues our disposition as remanding this case for the trial court to conduct additional hearings to determine Husband's present ability to pay. *See* Concurring and Dissenting Memorandum at 7. As discussed at length in the body of this memorandum, we remand for the court to fashion an alimony award based on the certified record.

The dissent also cites ***O'Callaghan v. O'Callaghan***, 607 A.2d 735, 737 n.5 (Pa. 1992) for the proposition that it is improper to remand a case for the reconsideration of alimony in isolation from the overarching equitable distribution scheme. In that case, the Supreme Court overruled our finding that the trial court abused its discretion in denying a wife's claim for permanent alimony based on the trial court's consideration of the relevant factors. ***Id***. at 737. It reasoned, "[o]n this record, we cannot conclude that insufficient evidence was presented to support the findings of the master as adopted by the trial court."). ***Id***. The decision included a footnote stating, "Having found that Superior Court abused its discretion in reversing the trial court with regard to the denial of alimony, it is unnecessary to address [H]usband's second issue regarding Superior Court's remand to the trial court for disposition of the alimony issue only." ***Id***. at n.5. Nevertheless, the Court continued, "it is clear that remanding a final order denying alimony for reconsideration of alimony alone without taking into consideration the equitable distribution award is improper." ***Id***. This *dictum* fuels the dissent's concern.

It is beyond cavil that alimony is a concomitant component of equitable distribution insofar as a trial court must consider the distribution of property in determining whether to award alimony. ***See Buccino v. Buccino***, 580 A.2d 13, 18 n.15 (Pa. 1990)("When fashioning an alimony award, a court must consider, *inter alia,* whether the property distributed through equitable distribution reasonably meets the needs of the dependent spouse"). However, the instant disposition does not implicate the concerns that the High Court highlighted in ***O'Callaghan*** because, unlike this Court's improper ruling in that case, we do not reverse the trial court's decision regarding whther or not

*(Footnote Continued Next Page)*

- 24 -

Order affirmed in part, vacated in part, and remanded for further proceedings. Jurisdiction relinquished.

Judge Stabile joins this Memorandum.

Judge Murray files a Concurring & Dissenting Memorandum.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/04/2024

---

to award alimony independent from the overarching equitable distribution scheme. In fact, consistent with **Buccino**, we unanimously endorsed the court's decision to award Wife alimony as a means of effectuating economic justice considering the assets she received in equitable distribution and her existing liabilities. We simply determined that, having found that Wife is entitled to receive alimony under the equitable distribution scheme, the trial court erred in ignoring Husband's struggle to pay the existing spousal support in ratifying the master's wholesale adoption of that amount as alimony. Hence, rather than disturbing Wife's entitlement to alimony as a component of the overall equitable distribution, as the dissent's reference to **O'Callaghan** suggests, our remand simply directs the trial court to adjust the award so that it is consistent with the evidence presented during the master's hearing.